# Whistleblower Protections for Classified Disclosures

A Senate bill addressing the disclosure to Congress of classified "whistleblower" information concerning the intelligence community is unconstitutional because it would deprive the President of the opportunity to determine how, when and under what circumstances certain classified information should be disclosed to Members of Congress.

A House bill addressing the same subject is constitutional because it contains provisions that allow for the exercise of the President's constitutional authority.

May 20, 1998

STATEMENT BEFORE THE
PERMANENT SELECT COMMITTEE ON INTELLIGENCE
U.S. HOUSE OF REPRESENTATIVES

I am pleased to be here to present the analysis of the Department of Justice concerning the constitutionality of S. 1668 and H.R. 3829, two bills that address disclosure to Congress of classified "whistleblower" information concerning the intelligence community.

As the Department has previously indicated, it is our conclusion that S. 1668, like the Senate passed version of section 306 of last year's Intelligence Authorization bill, is unconstitutional.[1] It is unconstitutional because it would deprive the President of the opportunity to determine how, when and under what circumstances certain classified information should be disclosed to Members of Congress—no matter how such a disclosure might affect his ability to perform his constitutionally assigned duties. In contrast, H.R. 3829 is constitutional because it contains provisions that allow for the exercise of that authority.

I begin by briefly summarizing the principal provisions of S. 1668 and H.R. 3829. I then review the relevant constitutional history and doctrine. I conclude by applying the relevant constitutional principles to the two bills. Because other witnesses at the hearing today can best address the practical concerns posed by legislation in this area, my remarks are limited to the relevant constitutional considerations.

## I.

### A.

S. 1668 would require the President to inform employees of covered federal agencies (and employees of federal contractors) that their disclosure to Congress

---

[1] In addition, the Department of Justice took a similar position with respect to comparable legislation in a brief that it filed in the Supreme Court in 1989 *See* Brief for Appellees, *American Foreign Serv Ass'n v Garfinkel*, 488 U.S 923 (1988) (No. 87–2127).

of classified information that the employee (or contractor) reasonably believes provides direct and specific evidence of misconduct "is not prohibited by law, executive order, or regulation or otherwise contrary to public policy." [2] The misconduct covered by the bill includes not only violations of law, but also violations of "any . . . rule[ ] or regulation," and it encompasses, among other things, "gross mismanagement, a gross waste of funds, [or] a flagrant abuse of authority." [3]

S. 1668 would thus vest any covered federal employee having access to classified information with a unilateral right to circumvent the process by which the executive and legislative branches accommodate each other's interests in sensitive information. Under S. 1668, any covered federal employee with access to classified information that—in the employee's opinion—indicated misconduct could determine how, when and under what circumstances that information would be shared with Congress. Moreover, the bill would authorize this no matter what the effect on the President's ability to accomplish his constitutionally assigned functions. As discussed below, such a rule would violate the separation of powers. [4]

## B.

H.R. 3829 would amend the Central Intelligence Agency Act and the Inspector General Act of 1978 to provide a means for covered executive branch employees and contractors to report to the Intelligence Committees certain serious abuses or violations of law or false statements to Congress that relate to "the administration or operation of an intelligence activity," as well as any reprisal or threat of reprisal relating to such a report. Under H.R. 3829, any employee or contractor who wishes to report such information to Congress would first make a report to the inspector general for the Central Intelligence Agency or their agency, as appropriate. If the complaint appears credible, the relevant inspector general would be required to forward the complaint to the head of his or her agency, and the head of the agency would generally be required to forward the report to the Intelligence Committees. Moreover, if the inspector general does not transmit the complaint to the head of the agency, the employee or contractor would generally be

---

[2] Section 1(a)(1)(A)

[3] *Id.* 1(a)(2)(A), (C)

[4] The Supreme Court has employed three principles in resolving separation of powers disputes First, where "[e]xplicit and unambiguous provisions of the Constitution prescribe and define     just how [governmental] powers are to be exercised," *INS v Chadha,* 462 U S 919, 945 (1983), the constitutional procedures must be followed with precision Second, where the effect of legislation is to vest Congress itself, its members, or its agents with "'either executive power or judicial power,'" the statute is unconstitutional *Metropolitan Wash Airports Auth. v Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S 252, 274 (1991) (citation omitted). Finally, legislation that affects the functioning of the Executive may be unconstitutional if it either "'impermissibly undermine[s]' the powers of the Executive Branch" or "'disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions '" *Morrison v Olson,* 487 U S 654, 695 (1988) (citations omitted) Because we conclude that S 1668 would violate separation of powers under even the most lenient of these tests, there is no need to resolve whether one of the more stringent standards applies

permitted to submit the complaint—under defined conditions—to the Committees directly.

Significantly, unlike S. 1668, H.R. 3829 provides that the head of the agency or the Director of Central Intelligence may determine "in the exceptional case and in order to protect vital law enforcement, foreign affairs, or national security interests" not to transmit the inspector general's report to the Intelligence Committees and not to permit the employee or contractor directly to contact the Intelligence Committees.[5] Whenever this authority is exercised, the head of the agency or the Director of Central Intelligence must promptly provide the Intelligence Committees with his or her reasons for precluding the disclosure. In this manner, H.R. 3829 would provide a mechanism for congressional oversight while protecting the executive interest in maintaining the strict confidentiality of classified information when necessary to the discharge of the President's constitutional authority. As a result, unlike S. 1668, H.R. 3829 is consistent with the constitutional separation of powers.

## II.

A host of precedents, beginning at the founding of the Republic, support the view that the President has unique constitutional responsibilities with respect to national defense and foreign affairs.[6] As was recognized in the *Federalist Papers* and by the first Congresses, secrecy is at times essential to the executive branch's discharge of its responsibilities in these core areas. Indeed, Presidents since George Washington have determined on occasion, albeit very rarely, that it was

---

[5] *See id.* § 2(a), proposed new paragraph (5)(E) to be added to subsection (d) of section 17 of the Central Intelligence Agency Act of 1949, 50 U S.C § 403q (1994 & Supp. II 1996), H R 3829, at § 2(b)(1), proposed new section 8H(e) to be added to the Inspector General Act of 1978, 5 U S.C app § 8 (1994 & Supp. II 1996).

[6] The President's national security and foreign affairs powers flow, in large part, from his position as Chief Executive, U S. Const art II, § 1, cl 1, and as Commander in Chief, *id* art II, § 2, cl 1 They also derive from the President's more specific powers to "make Treaties," *id* art II, § 2, cl. 2, to "appoint Ambassadors and Consuls," *id*, and to "receive Ambassadors and other public Ministers," *id.* art II, § 3 *See The Federalist No 64*, at 392–94 (John Jay) (Clinton Rossiter ed, 1961) The Supreme Court has repeatedly recognized the President's authority with respect to foreign policy *See, e g, Department of the Navy v Egan*, 484 U S 518, 529 (1988) (the Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive' ") (quoting *Haig v Agee*, 453 U.S 280, 293–94 (1981)), *Alfred Dunhill of London, Inc v Republic of Cuba*, 425 U S 682, 705 n.18 (1976) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch "), *United States v. Louisiana*, 363 U S 1, 35 (1960) (the President is "the constitutional representative of the United States in its dealings with foreign nations"); *New York Times Co v United States*, 403 U.S 713, 741 (1971) (Marshall, J, concurring) ("it is beyond cavil that the President has broad powers by virtue of his primary responsibility for the conduct of our foreign affairs and his position as Commander in Chief"), *id* at 761 (Blackmun, J, dissenting) ("Article II vests in the Executive Branch primary power over the conduct of foreign affairs and places in that branch the responsibility for the Nation's safety "), *see also United States v Kin-Hong*, 110 F.3d 103, 110 (1st Cir 1997) ("[O]ur constitutional structure . places primary responsibility for foreign affairs in the executive branch . . . ."), *Ward v. Skinner*, 943 F 2d 157, 160 (1st Cir 1991) (Breyer, J ) ("[T]he Constitution makes the Executive Branch primarily responsible" for the exercise of "the foreign affairs power "), *cert. denied*, 503 U S 959 (1992), *Sanchez-Espinoza v. Reagan*, 770 F 2d 202, 210 (D C Cir 1985) (Scalia, J ) ("[B]road leeway" is "traditionally accorded the Executive in matters of foreign affairs ")

necessary to withhold from Congress, if only for a limited period of time, extremely sensitive information with respect to national defense or foreign affairs.[7]

Perhaps the most famous of the Founders' statements on the need for secrecy is John Jay's discussion in the *Federalist Papers*. Jay observed:

> There are cases where the most useful intelligence may be obtained, if the persons possessing it can be relieved from apprehensions of discovery. Those apprehensions will operate on those persons whether they are actuated by mercenary or friendly motives; and there doubtless are many of both descriptions who would rely on the secrecy of the President, but who would not confide in that of the Senate, and still less in that of a large popular assembly. The convention have done well, therefore, in so disposing of the power of making treaties that although the President must, in forming them, act by the advice and consent of the Senate, yet he will be able to manage the business of intelligence in such manner as prudence may suggest.[8]

Our early history confirmed the right of the President to decide to withhold national security information from Congress under extraordinary circumstances. In the course of investigating the failure of General St. Clair's military expedition of 1791, the House of Representatives in 1792 requested relevant documents from the executive branch.[9] President Washington asked the Cabinet's advice as to his proper response "because [the request] was the first example, and he wished that so far as it should become a precedent, it should be rightly conducted."[10] Washington's own view was that "he could readily conceive there might be papers of so secret a nature, as that they ought not to be given up."[11]

A few days later a unanimous Cabinet—including Secretary of State Thomas Jefferson, Secretary of the Treasury Alexander Hamilton, and Attorney General

---

[7] *See History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op O.L.C. 751 (1982) (compiling historical examples of cases in which the President withheld from Congress information the release of which he determined could jeopardize national security).

[8] *The Federalist No. 64*, at 392 93 (John Jay) (Clinton Rossiter ed., 1961).

[9] For recent scholarly discussions of this episode and its significance for the development of separation of powers, *see* Gerhard Casper, *Separating Power* 28–31 (1997); David P. Currie, *The Constitution in Congress: The Federalist Period 1789–1801*, at 163–64 (1997).

An earlier episode had occurred in 1790 when, in response to a request from the House of Representatives, Secretary of State Thomas Jefferson furnished that body with a report on Mediterranean trade. The report also touched on advice provided by a confidential European source on the possibility of buying peace with Algiers, which was endangering that trade. Jefferson relayed the source's advice to the House, but stated that his or her "name is not free to be mentioned here." Report of Secretary of State Jefferson, Submitted to the House of Representatives (Dec. 30, 1790) and Senate (Jan. 3, 1791), *in* 1 *American State Papers. Foreign Relations* 105 (1791). Jefferson also submitted the report with a request that the Speaker treat it as a *secret* document; and when the report was received, the House's galleries were cleared. *See* Casper, *supra* at 47–50. The executive branch continues the practice of redacting identifying information on confidential sources when providing secret information to Congress.

[10] 1 *Writings of Thomas Jefferson* 303 (Andrew Lipscomb ed. 1903) (The Anas).

[11] *Id.*

Edmund Randolph—concurred. The Cabinet advised the President that, although the House "might call for papers generally," "the Executive ought to communicate such papers as the public good would permit, and ought to refuse those, the disclosure of which would injure the public." [12] The Executive "consequently w[as] to exercise a discretion" in responding to the House request.[13] The Cabinet subsequently advised the President that the documents in question could all be disclosed consistently with the public interest.[14]

Although President Washington ultimately decided to produce the requested documents, they were actually produced only after the House, on April 4, 1792, substituted a new request apparently recognizing the President's discretion by asking only for papers "of a public nature." [15]

Two years later, President Washington adhered to his conclusion regarding the respective authorities of the executive and legislative branches. Acting upon the advice of Attorney General William Bradford and other Cabinet officers, Washington responded to an unqualified request from the Senate for correspondence between the Republic of France and the United States minister for France by providing the relevant correspondence, except for "those particulars which, in [his] judgment, for public considerations, ought not to be communicated." [16]

In 1796, when a controversy arose regarding whether President Washington could be required to provide the House of Representatives with records relating to the negotiation of the Jay Treaty, James Madison—who was then a Member of the House—conceded that even where Congress had a legitimate purpose for requesting information the President had authority "to withhold information, when of a nature that did not permit a disclosure of it at the time." [17]

---

[12] *Id.* at 304.

[13] *Id.*

[14] *Id* at 305

[15] 3 Annals of Cong 536 (1792); *see also* Abraham D. Sofaer, *War, Foreign Affairs and Constitutional Power* 82–83 (1976), Casper, *supra* at 29.

[16] 4 Annals of Cong 56 (1794), *see* Sofaer, *supra* at 83–85. The Cabinet officers whom Washington consulted and who all agreed that he could withhold at least part of the material from the Senate were Hamilton, Randolph and Knox. *Id.* at 83 Randolph also informed Washington that he had met privately with Madison and with Justice James Wilson (another influential Framer), who provided similar advice *Id* at 83–84 n *. "[N]o further Senate action was taken to obtain the material withheld " *Id.* at 85.

[17] 5 Annals of Cong. 773 (1796) As President Washington observed in declining the House's request

   The nature of foreign negotiations requires caution, and their success must often depend on secrecy, and even, when brought to a conclusion, a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely impolitic: for this might have a pernicious influence on future negotiations; or produce immediate inconveniences, perhaps danger and mischief, in relation to other Powers

*Id* at 760. Washington had previously sought and received advice from Alexander Hamilton, then in private practice in New York Hamilton provided Washington with a draft answer to the House, which had stated in part "A discretion in the Executive Department how far and where to comply in such cases is essential to the due conduct of foreign negotiations " Letter from Alexander Hamilton to George Washington (Mar 7, 1796), *in* 20 The Papers of Alexander Hamilton at 68 (Harold C Syrett ed , 1974)

   Although the Executive's concerns with the confidentiality of diplomatic materials certainly loomed large in the 1796 dispute, it would overstate the point to view the entire controversy as turning exclusively on the issue of "executive privilege " Washington rested his position partly on the alternative ground that the Constitution gave the House no role in the treaty-making process Moreover, it appears that the controversy "had a somewhat 'aca-

Congressional recognition of this power in the President extends well into recent times.[18] Moreover, since the Washington Administration, Presidents and their senior advisers have repeatedly concluded that our constitutional system grants the executive branch authority to control the disposition of secret information. Thus, then-Attorney General Robert Jackson declined, upon the direction of President Franklin Roosevelt, a request from the House Committee on Naval Affairs for sensitive FBI records on war-time labor unrest, citing (among other grounds) the national security.[19] Similarly, then- Assistant Attorney General William Rehnquist concluded almost thirty years ago that "the President has the power to withhold from [Congress] information in the field of foreign relations or national security if in his judgment disclosure would be incompatible with the public interest." [20]

The Supreme Court has similarly recognized the importance of the President's ability to control the disclosure of classified information. In considering the statutory question whether the Merit Systems Protection Board could review the revocation of an executive branch employee's security clearance, the Court in *Department of the Navy v. Egan* also addressed the President's constitutional authority to control the disclosure of classified information:

> The President . . . is the "Commander in Chief of the Army and Navy of the United States." U.S. Const., Art. II, § 2. His authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant. . . . This Court has recognized the Government's "compelling interest" in withholding national security information from unauthorized persons in the course of executive business. . . . The authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief.[21]

Similarly, in discussing executive privilege in *United States v. Nixon*, a unanimous Supreme Court emphasized the heightened status of the President's privilege

---

demic' character because the Senate had received all the papers, and the House members apparently could inspect them at the Senate." Casper, *supra* at 65

[18] *See, e.g.*, S Rep. No. 86–1761, at 22 (1960) (the Senate Committee on Foreign Relations, after failing to persuade President Kennedy to abandon his claim of executive privilege with respect to information relating to the U–2 incident in May, 1960, criticized the President for his refusal to make the information available but acknowledged his legal right to do so· "The committee recognizes that the administration has the legal right to refuse the information under the doctrine of executive privilege.").

[19] *See Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 46 (1941)

[20] Memorandum from John R. Stevenson, Legal Adviser, Department of State, and William H Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President's Executive Privilege to Withhold Foreign Policy and National Security Information* at 7 (Dec. 8, 1969).

[21] *Department of the Navy v. Egan*, 484 U S. at 527 (citations omitted)

in the context of "military, diplomatic, or sensitive national security secrets." [22] Although declining in the context of that criminal case to sustain President Nixon's claim of privilege as to tape recordings and documents sought by subpoena, the Supreme Court specifically observed that the President had not "place[d] his claim of privilege on the ground that they are military or diplomatic secrets. As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." [23]

Other statements by individual Justices and the lower courts reflect a similar understanding of the President's power to protect national security by maintaining the confidentiality of classified information.[24] Justice Stewart, for example, discussed this authority in his concurring opinion in *New York Times Co. v. United States* (the "Pentagon Papers" case):

> [I]t is elementary that the successful conduct of international diplomacy and the maintenance of an effective national defense require both confidentiality and secrecy. . . . In the area of basic national defense the frequent need for absolute secrecy is, of course, self-evident.
>
> I think there can be but one answer to this dilemma, if dilemma it be. The responsibility must be where the power is. If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully. . . . [I]t is clear to me that it is the constitutional duty of the Executive . . . to protect the confidentiality necessary to carry out its respon-

---

[22] *United States v. Nixon*, 418 U S. 683, 706 (1974), *see also id* at 710, 712 n 19

[23] *Id*. at 710, *see also United States v. Reynolds*, 345 U S 1 (1953) (recognizing privilege in judicial proceedings for "state secrets" based on determination by senior Executive officials)

[24] *See, e g, Webster v Doe*, 486 U.S 592, 605–06 (1988) (O'Connor, J , concurring in part and dissenting in part) ("The functions performed by the Central Intelligence Agency and the Director of Central Intelligence lie at the core of 'the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations '. . The authority of the Director of Central Intelligence to control access to sensitive national security information by discharging employees deemed to be untrustworthy flows primarily from this constitutional power of the President ") (citation omitted), *New York Times Co. v. United States*, 403 U S at 741 (Marshall, J , concurring) (case presented no issue "regarding the President's power as Chief Executive and Commander in Chief to protect national security by disciplining employees who disclose information and by taking precautions to prevent leaks"), *Greene v. McElroy*, 360 U.S 474, 513 (1959) (Clark, J , dissenting) (it is "basic" that "no person, save the President, has a constitutional right to access to governmental secrets"); *Guillot v Garrett*, 970 F 2d 1320, 1324 (4th Cir 1992) (President has "exclusive constitutional authority over access to national security information"); *Dorfmont v Brown*, 913 F 2d 1399, 1405 (9th Cir 1990) (Kozinski, J , concurring) ("Under the Constitution, the President has unreviewable discretion over security decisions made pursuant to his powers as chief executive and Commander-in-Chief "), *cert denied*, 499 U S. 905 (1991)

sibilities in the fields of international relations and national defense.[25]

## III.

In applying these constitutional principles to S. 1668 and H.R. 3829, we take as a given that Congress has important oversight responsibilities and a corollary interest in receiving information that enables it to carry out those responsibilities.[26] Those interests obviously include Congress's ability to consider evidence of misconduct and abuse by the Executive's agents. H.R. 3829, however, demonstrates that it is possible to develop procedures for providing Congress information it needs to perform its oversight duties, while not interfering with the President's ability to control classified information when necessary to perform his constitutionally assigned duties.

## A.

In analyzing S. 1668, there is no need to resolve the precise parameters of the President's authority to control access to classified diplomatic and national security information. Instead, we have focused on the specific problem presented by the bill, which, in defined circumstances, gives a unilateral right of disclosure to every executive branch employee with access to classified information.[27] The reach of S. 1668 is sweeping: it would authorize any covered federal employee to foreclose or circumvent a presidential determination that restricts congressional access to certain classified information in extraordinary circumstances.

S. 1668 is inconsistent with Congress's traditional approach to accommodating the executive branch's interests with respect to national security information. In the National Security Act, for example, Congress itself recognized the need for heightened secrecy in certain "extraordinary circumstances affecting vital interests of the United States," and authorized the President to sharply limit congressional access to information relating to covert actions in such cases.[28] An example of

---

[25] *New York Times Co v United States,* 403 U S at 728–30 (Stewart, J., concurring) (footnote omitted)

[26] *See, e g., McGrain v. Daugherty,* 273 U S 135 (1927)

[27] We do not use the word "right" in the sense of a legally enforceable right. Rather, the term is intended to convey our understanding that the bill would purport to require the President to inform employees that they have standing authorization or permission to convey national security information directly to Congress without receiving specific authorization to convey the particular information in question We have not analyzed the possible implications this legislation might have with respect to judicial enforcement of employee legal rights.

[28] *See* 50 U.S.C § 413b(c)(2) (1994) ("If the President determines that it is essential to limit access to the finding to meet extraordinary circumstances affecting vital interests of the United States, the finding may be reported to the chairmen and ranking minority members of the intelligence committees, the Speaker and minority leader of the House of Representatives, the majority and minority leaders of the Senate, and such other member or members of the congressional leadership as may be included by the President "). Even with this more protective standard, President Bush expressly reserved his constitutional authority to withhold disclosure for a period of time *See* S Rep. No. 102–85, at 40 (1991) *See also* 50 U S C. § 413b(c)(3) (1994) ("Whenever a finding is not reported pursuant

Continued

accommodation between the branches that is even more directly applicable to the present context is the National Security Act's recognition that the intelligence agencies on occasion need to redact sources and methods and other exceptionally sensitive intelligence information from materials they provide to the Intelligence Committees.[29]

In contrast, S. 1668 would deprive the President of his authority to decide, based on the national interest, how, when and under what circumstances particular classified information should be disclosed to Congress.[30] This is an impermissible encroachment on the President's ability to carry out core executive functions. In the congressional oversight context, as in all others, the decision whether and under what circumstances to disclose classified information must be made by someone who is acting on the official authority of the President and who is ultimately responsible to the President. The Constitution does not permit Congress to authorize subordinate executive branch employees to bypass these orderly procedures for review and clearance by vesting them with a unilateral right to disclose classified information—even to Members of Congress. Such a law would squarely conflict with the Framers' considered judgment, embodied in Article II of the Constitution, that, within the executive branch, all authority over matters of national defense and foreign affairs is vested in the President as Chief Executive and Commander in Chief.[31]

It has been suggested that S. 1668 (at least with modest revisions) would strike an acceptable balance between the competing executive and legislative interests relating to the control of classified information, and would thus survive review under ordinary separation of powers principles.[32] That balance under S. 1668, however, would be based on an abstract notion of what information Congress might need to know relating to some future inquiry and what information the President might need to protect in light of some future set of world events. Such an abstract resolution of the competing interests at stake is simply not consistent with the President's constitutional responsibilities respecting national security and foreign affairs. He must be free to determine, based on particular—and perhaps

---

to paragraph (1) or (2) of this section, the President shall fully inform the intelligence committees in a timely fashion and shall provide a statement of the reasons for not giving prior notice.'').

[29] *See* 50 U.S.C. § 413a (1994) ("To the extent consistent with due regard for the protection from unauthorized disclosure of classified information relating to sensitive intelligence sources and methods or other exceptionally sensitive matters, the Director of Central Intelligence and the heads of all departments, agencies, and other entities of the United States Government involved in intelligence activities shall . . keep the intelligence committees fully and currently informed of all intelligence activities '')

[30] *Cf United States ex rel Touhy v Ragen*, 340 U S 462, 468 (1951) ("When one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure , the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas *duces tecum* will be willingly obeyed or challenged is obvious '')

[31] This is not to suggest that Congress wholly lacks authority regarding the treatment of classified information, *see New York Times Co v United States*, 403 U S at 740 (White, J., concurring), but rather that Congress may not exercise that authority in a manner that undermines the President's ability to perform his constitutionally assigned duties.

[32] *See Whistleblower Protections for Classified Disclosures· Hearings Before the Senate Select Comm on Intelligence*, 105th Cong. 8 (1998) (statement of Prof. Peter Raven-Hansen)

currently unforeseeable—circumstances, that the security or foreign affairs interests of the Nation dictate a particular treatment of classified information.

Furthermore, S. 1668 also undermines the traditional, case-by-case process of accommodating the competing needs of the two branches—a process that reflects the facts and circumstances of particular situations. As one appellate court has observed, there exists "an implicit constitutional mandate to seek optimal accommodation [between the branches] through a realistic evaluation of the needs of the conflicting branches *in the particular fact situation.*" [33] Rather than enabling balances to be struck as the demands of specific situations require, S. 1668 would attempt to legislate a procedure that cannot possibly reflect what competing executive and legislative interests may emerge with respect to some future inquiry. It would displace the delicate process of arriving at appropriate accommodations between the branches with an overall legislated "solution" that paid no regard to unique—and potentially critical—national security and foreign affairs considerations that may arise. This approach contrasts with that of H.R. 3829, which would balance the competing legislative and executive interests at stake in a manner that would permit rational judgments to be made in response to real world events.

## B.

H.R. 3829 does not present the constitutional infirmity posed by S. 1668. H.R. 3829 does not vest any executive branch employee who has access to classified information with a unilateral right to determine how, when and under what circumstances classified information will be disclosed to Members of Congress and without regard for how such a disclosure might affect the President's ability to perform his constitutionally assigned duties.

Instead, H.R. 3829 would establish procedures under which employees who wish to report to Congress must first submit their complaint to an inspector general, who would review it for credibility and then submit the complaint to the agency head before it is forwarded to Congress. This process would allow for the executive branch review and clearance process that S. 1668 would foreclose. H.R. 3829 would further authorize heads of agencies and the Director of Central Intelligence, upon the completion of that process, to decide not to transmit an employee's complaint to the Intelligence Committees, or allow the employee to contact the Committees directly, "in the exceptional case and in order to protect vital law enforcement, foreign affairs, or national security interests." [34] If such

---

[33] *United States v. American Tel & Tel Co*, 567 F 2d 121, 127 (D.C. Cir. 1977) (emphasis added).

[34] In light of S 1668's focus on the intelligence community and classified information, the Department's analysis of the bill's constitutionality has focused on its interference with the President's authority to protect confidential national security and foreign affairs information. Of course, other constitutionally-based confidentiality interests can be implicated by employee disclosures to Congress H R 3829 appropriately recognizes that such disclosures also should not compromise vital law enforcement interests

a decision were made, then the head of agency or Director of Central Intelligence would be required to provide the Committees with the reason for the determination.

Not only would H.R. 3829 thus avoid the constitutional infirmity of S. 1668 by allowing for review by the President or officials responsible to him, it would also allow for the operation of the accommodation process traditionally followed between the legislative and executive branches regarding disclosure of confidential information. Upon receipt of the explanation for a decision not to allow an employee complaint to go forward, the Intelligence Committees could contact the agency head or Director of Central Intelligence to begin the process of seeking to satisfy the Committees' oversight needs in ways that protect the executive branch's confidentiality interests. The bill's procedures are thus consistent with our constitutional system of separation of powers.

## IV.

We recognize that Congress has significant interests in disclosure of evidence of wrongdoing or abuse. There is an inevitable tension, however, between preserving the secrecy necessary to permit the President to perform his constitutionally assigned duties and permitting the disclosures necessary to permit congressional oversight. Under relevant constitutional doctrine, Congress may not resolve this tension by vesting in individual federal employees the power to control disclosure of classified information. For this reason, we have concluded that S. 1668 is unconstitutional. H.R. 3829 does not contain this constitutional infirmity and is constitutional.

RANDOLPH D. MOSS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*